**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL TURSKY, | |
| Plaintiff, | Civ. No 14-03241 (FLW) |
| v. | OPINION |
| CAROLYN C. COLVIN, | |
| *Acting Comm'r, Social Security* | |
| *Administration,* | |
| Defendants. | |

## WOLFSON, U.S. DISTRICT JUDGE:

Paul Tursky ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security ("Defendant") denying Plaintiff disability benefits under Title II of the Social Security Act ("SSA"). Plaintiff contends that the record does not support the decision made by the Administrative Law Judge ("ALJ"). Specifically, Plaintiff argues that the ALJ (1) failed to evaluate whether Plaintiff's impairments met or equaled a listed impairment, (2) made an unsupported determination of Plaintiff's residual functional capacity ("RFC"), and (3) did not meet her burden of proving that Plaintiff could perform other work.

After reviewing the Administrative Record, this Court finds it would be appropriate to remand this matter because (1) the ALJ's Step Three determination of whether Plaintiff's orthopedic and mental impairments met or equaled listings 1.04 and 12.02–12.08, respectively, did not provide this Court with a clear and satisfactory explication of her decision; and (2) the ALJ's Step Four RFC assessment did not adequately consider the objective medical evidence with respect to

Plaintiff's left upper extremity limitations. Accordingly, this case is remanded for further proceedings before the ALJ consistent with this Opinion.

## I. Factual Background and Procedural History

Plaintiff was born on July 23, 1963 and was 47 years old at the time of the alleged disability onset date of January 15, 2011. Administrative Record (hereinafter "A.R.") 124. Plaintiff has a high school education and certification from electrical vocational school. A.R. 124–25. Before his disability onset date, Plaintiff was an electrical and maintenance worker. A.R. 144. Plaintiff owned a restoration company from 2000 to January 2011, where he performed maintenance on bathrooms and kitchens. A.R. 143. Plaintiff reportedly stopped working as a result of sciatica, migraine headaches and back problems. AR. 64. Plaintiff additionally alleges disability due to pan hypopituitarianism, cognitive disorder, learning disability, major depression, status post malignant brain chordoma, bursitis, herniated discs, anxiety disorder, left hip pain, status post trans-ischemic episodes, obesity, low testosterone, migraine headaches, sixth nerve palsy, carpal tunnel syndrome, attention deficit disorder, and hypothyroidism. A.R. 63.

Plaintiff applied for Social Security Disability Benefits ("SSDIB") on March 21, 2011, alleging disability beginning on January 15, 2011. A.R. 58. The application was initially denied on March 2, 2012. *Id.* Plaintiff requested reconsideration, which was denied. Plaintiff requested a hearing by an Administrative Law Judge ("ALJ") on March 12, 2012. *Id.* A hearing was held before ALJ Michelle Wolfe on February 22, 2013. *Id.* On March 12, 2013, the ALJ issued an unfavorable decision denying Plaintiff benefits on the basis that he was not disabled. A.R. 55. Plaintiff requested review by the Appeals Council on March 12, 2013. A.R. 1. However, the Appeals Council denied his request for review on March 26, 2014. *Id.* Plaintiff filed the instant action against the Commissioner on May 21, 2014.

Plaintiff filed a new application for SSDIB on May 18, 2014 and was approved at the initial level with an onset date of March 13, 2013. Pl. Br. at 2. Therefore, the instant action was amended to reflect an appeal for an earlier onset date of benefits of January 15, 2011 through the approved onset date of March 13, 2013. *Id.*

## A. Review of the Medical Evidence

Prior to the alleged disability onset date, January 15, 2011, the medical evidence disclosed diagnoses of diabetes mellitus, osteoarthritis with torn right meniscus, and mild impingement of the left shoulder. A.R. 293–95.

In 2005, Plaintiff was diagnosed with a clivus chordoma and soon after had the tumor removed at Massachusetts General Hospital. A.R. 317. Plaintiff received proton and photon radiation treatment and developed radiation-induced hypothalamic-pituitary dysfunction, which required hormonal replacement. A.R. 65, 321, 455. Early medical records show that Plaintiff also had a history of acute onset left sixth nerve palsy, migraine headaches, probable carpal tunnel syndrome, mood disorder, panic disorder, and adult attention deficit disorder ("ADD"). A.R. 65, 328.

In 2010, diagnostic and neuropsychological evaluations by Lee Anne Hausler, Ph.D. and Kathleen Hodgkiss, Ph.D. revealed cognitive disorder, attention deficit/hyperactivity disorder ("ADHD"), panic disorder, and mood disorder. A.R. 355. In January 2011, Robert Pinke, M.D. evaluated Plaintiff for reported visual problems and assessed his visual acuity as 20/40 (OD) and 20/30 (OS). A.R. 432. In July 2011, Plaintiff's visual acuity was 20/25. A.R. 434.

On March 22, 2011, shortly after Plaintiff's alleged disability onset date, neurologist Michael Schulder, M.D. indicated that Plaintiff reported one to two episodes of sixth nerve palsy per year. A.R. 455. Dr. Schulder noted testosterone regulation difficulties, but found Plaintiff to be neurologically intact with fluent speech and intact comprehension, with steady gait, appropriate

affect, and equal face movements. *Id.* An MRI revealed no evidence of tumor recurrence, and Dr. Schulder concluded that Plaintiff had "control of the chordoma." *Id*. He advised the Plaintiff to stop working due to physical stress. *Id*.

In April 2011, neurologist Wayne Greene, M.D. noted that Plaintiff's headaches were "doing rather well," though Plaintiff complained of shoulder, back, hip, and knee problems that were disabling him from work. A.R. 595. Dr. Greene indicated that Plaintiff had "good power and tone in the upper and lower extremities," symmetrical deep tendon reflexes, and unremarkable gait. *Id*. Earlier records revealed that Plaintiff's headaches were "well controlled," and he had only experienced one headache between October 2009 and February 2010. A.R. 596. There were no signs of recurrence of the chordoma, and his hip pain was "in control." A.R. 596–97.

Also in April, Robert Petrucelli, M.D. diagnosed mild multilevel degenerative disc disease, facet arthropathy, C5-6 concentric disc bulge, mild disc bulging at both L3-4 and L4-5, and uncovertebral hypertrophy causing at least mild bilateral neuroforaminal narrowing without significant spinal canal stenosis. AR. 60914. Plaintiff complained of left hip pain with numbness radiating down his left leg, numbness in his left arm into his fingers, subacute pain in his right knee, pain and restriction of motion in his cervical spine, weakness to an abduction force in his shoulder at ninety degrees, and some "questionably positive" straight leg raising. A.R. 609.

On April 18, 2011, orthopedist Eugene Cullen, M.D. diagnosed Plaintiff with left shoulder adhesive capsulitis, anxiety, depression, ADHD, and learning disorder. A.R. 592. Dr. Cullen noted that Plaintiff suffered from cognitive deficit with reduced memory and concentration, as well as difficulty with reading and writing. *Id.* Dr. Cullen indicated that Plaintiff could not work due to his standing ability being limited to ten minutes, driving limited to thirty minutes, and alternative work being severely limited by his mood disorders and learning disabilities. A.R. 593. X-rays

4

revealed mild degenerative changes in the mild and lower thoracic spine, as well as in the lower lumbar spine. A.R. 625.

From April 8, 2011 to April 28, 2011, Plaintiff underwent physical therapy at Cornerstone for his left shoulder, which displayed limited range of movement, poor extension, decreased muscle strength, great difficulty with overhead elevation, and increased tenderness. A.R. 633–34. Upon discharge, Plaintiff still suffered pain and decreased strength, but had increased range of motion and responded "well" to treatment. A.R. 640. Plaintiff reported severe difficulty or inability to push open a heavy door, do heavy household chores, make a bed, carry a heavy object, wash or blow dry his hair, or put on a pullover sweater. A.R. 644. The physical therapist indicated functional limitations with reading, repetitive activity, pushing, pulling, and lifting. A.R. 640.

In May 2011, orthopedist James Scales, M.D., who had treated Plaintiff since 2003 for various injuries, diagnosed chronic cervical and thoracolumbar spine pain secondary to deconditioning, chronic partial tear of the left rotator cuff, and impaired function. A.R. 673. Also in May, Plaintiff's treating psychologist since 1998[1], Christopher Wright, Ph.D., diagnosed major depressive disorder, personality disorder, and pandemic joint deterioration. A.R. 675. Dr. Wright further noted educational, occupational, and primary support group problems. *Id.* Upon examination, Plaintiff revealed severe, protracted depression, anhedonia, diminished self-efficacy, and poor concentration and attention. *Id.* Regarding Plaintiff's employment, Dr. Wright discussed his "noteworthy defiance and poor compliance with instructions, interpersonal difficulties with others (including supervisors) and markedly substandard productivity." *Id*. In addition, he characterized

---

[1] In his testimony, Plaintiff explained that "in the 1990s," Dr. Wright was exclusively seeing Plaintiff as his patient. A.R. 137. However, in the "late 1990s," Plaintiff and his wife began visiting Dr. Wright for joint sessions. A.R. 138.

Plaintiff's time management by "poor organization and tardiness" and offered a Global Assessment of Function ("GAF") number of 35. *Id.*

Although Dr. Wright reported that Plaintiff had allegedly "made good use of his therapy" in the past, he concluded that his "profound deterioration of physical capacity and the deteriorating effects of his wife's illness" had led to severe depression. *Id.* In light of Plaintiff's inability to continue his then-present employment, in addition to his cognitive deficits, Dr. Wright concluded that Plaintiff faced a "bleak and formidable future." *Id.*

In a letter to the Department of Labor and Workforce Development dated October 6, 2011, Dr. Wright wrote that Plaintiff was forced to leave work due to his "deteriorating medical condition." A.R. 710. Dr. Wright described Plaintiff's failed attempts to secure other employment, which led to an "exacerbation of diminished self-efficacy, [increasing] hopelessness, and [intensified] depression." *Id.*

On June 18, 2011, Christopher Parigoris, Psy.D. diagnosed Plaintiff with cognitive disorder, ADHD, and depressive disorder. A.R. 733. Plaintiff rated his anxiety as a "3" and depression a "5," on a scale from zero to ten. A.R. 731. Dr. Parigoris also gave Plaintiff a GAF of 60. *Id.* Dr. Parigoris noted that Plaintiff previously had suicidal ideations and was taking Prozac, Ritalin, and Xanax. A.R. 732. Plaintiff had seen Dr. Parigoris for complaints relating to ADHD, cognitive problems, depression, anger problems, and his marriage difficulties since July 2010. A.R. 156.

Plaintiff's treating physician, Gary Arvary, M.D., stated on December 9, 2011, that Plaintiff exhibited weakness and paresis due to a spinal cord tumor, as well as sensory deficit of the lower extremities. A.R. 745–46. Dr. Arvary also indicated Plaintiff had difficulty concentrating. A.R. 746. He diagnosed disc herniation, empty sella syndrome, ADD, worsening cognitive function, status post clival chordoma, hypertension, hypothyroid, and migraines. A.R. 747. Dr. Arvary noted

that Plaintiff suffered from limitations in his ability to stand, walk, climb, stoop, bend, lift, and concentrate. A.R. 748. He opined that Plaintiff would never be able to resume any type of employment. A.R. 749. In January 2012, Plaintiff complained of low back pain, although it was "improving" and was alleviated by epidural injections. A.R. 764.

In a Functional Capacity Evaluation ("FCE") conducted by Heather Sleece, P.T., Plaintiff was not able to complete all testing due to "self limiting behavior" and the inability to tolerate the minimum [four] hours for the evaluation. A.R. 712. Therefore, Ms. Sleece did not believe Plaintiff would be able to complete an eight-hour workday. *Id*.

However, Ms. Sleece also indicated that Plaintiff demonstrated an ability to function in the "Light Physical Demand Level" for an eight-hour workday. *Id.* Plaintiff demonstrated the ability to occasionally lift up to 20 lbs. floor to waist, 30 lbs. waist to shoulder, carry up to 20 lbs., push 72 lbs. of force, and pull 72 lbs. of force. *Id.* He also demonstrated "frequent standing, walking, frequent reaching at disk level, reach[ing] at shoulder level, reach[ing] [at] floor level, object handling, simple hand grasp, . . . firm hand grasp, . . . occasional sitting, stair climbing, balancing, stooping, crouching, fingering, and fine/gross manipulation." *Id*.

In October 2011, orthopedist Alena Polesin, M.D. noted Plaintiff had improved left lumbar radiculitis with discogenic and chronic back strain related to low back pain and due to overuse. A.R. 781. Dr. Polesin noted that Plaintiff "did very well with" two epidural steroid injections at the L5-S1 level. A.R. 780.

Other orthopedists of Tri-County Spine Center subsequently indicated that Plaintiff had normal gait and coordination, good balance and stability, no significant range of motion restrictions, no atrophy, normal muscle tone and full strength in key muscle groups, intact sensation, symmetric deep tendon reflexes, and negative straight leg raise. A.R. 781–85. Further, Charles Gatto, M.D.

7

found normal alignment, no atrophy, and no pain to palpation, as well as good motion in his back with no instability. A.R. 782. Dr. Gatto diagnosed Plaintiff with a mild L4-5 disc bulge, left-sided disc herniation, and left lower extremity L5 sensory radiculitis. A.R. 783. Paul Lombardi, M.D. found that Plaintiff walked with a mild antalgic gait to the left lower extremity, but he had full strength with all musculature. *Id*.

Plaintiff consulted pain management specialist Shan Nagendra, M.D. between 2012 and 2013. A.R. 821–49. Plaintiff complained of constant lower back pain radiating down to the knee, sharp hip pain, and difficulties walking, sleeping, and sitting. A.R. 846. Dr. Nagendra also noted that Plaintiff felt dizziness, suffered headaches, and had pain in his left shoulder. A.R. 839.

In October 2012, Psychotherapist Marilyn Gaesser noted Plaintiff's history of depression, ADD, and suicidal ideations. A.R. 835. Ms. Gaesser reported that Plaintiff was unable to work, although he did enjoy hobbies such as painting and writing. *Id*. She further indicated that Plaintiff's disorganization led to marital problems. *Id*. In November, Ms. Gaesser wrote that Plaintiff felt better following an increase in his Prozac dosage, but they continued to discuss how his disabilities limited his job search. *Id*.

In response to Plaintiff's application for the Division of Vocational Rehabilitation ("DVS") services, Counselor Donna Erickson reviewed his medical records and noted moderate weakness of the left upper and left lower extremity, decreased left side movement, impaired gait, poor standing tolerance, and difficulty walking greater than five minutes. A.R. 286. Ms. Erickson noted that Plaintiff's FCE revealed his inability to work an 8-hour day, as well as to tolerate the minimum four hours necessary to complete the evaluation. *Id*. She concluded that, given his physical and mental limitations, Plaintiff would have "a great deal of difficulty" completing training, even for sedentary work. *Id*.

8

### B. Review of Disability Determinations

Plaintiff filed his initial claim for disability on March 21, 2011, alleging an onset date of January 15, 2011 due to panhypopituitarism, cognitive deficits, depression, status-post malignant brain chordoma, bursitis, depression, herniated discs, anxiety, left hip pain, obesity, low testosterone, sixth nerve palsy, carpal tunnel syndrome, attention deficit disorder, and hypothyroidism. A.R. 152–53. Plaintiff had not worked after the alleged onset date. A.R. 153. The non-examining medical/psychological consultants with the Disability Determination Service ("DDS") reviewed evidence from the following treating physicians: Drs. Parigoris, Schulder, Rosenfeld, Arvary, Pinke, Wright, Scales, Greene, Youngren, and Berman. A.R. 154–55. The state agency consultants determined that a consultative examination was unnecessary. *Id.* The consultants determined that Plaintiff had numerous severe impairments, including soft tissue tumors of the head and neck, dysfunction of major joints, affective disorders, and organic mental disorders. A.R. 157. With respect to Plaintiff's organic mental and affective disorders, the consultants found that Plaintiff's impairments did not satisfy the 'A' or 'C' criteria of the listings. A.R. 157. Further, Plaintiff was found to only have "moderate" restrictions of daily living, difficulties in maintaining social function, and difficulties in maintaining concentration, persistence, and pace. A.R. 158.

In determining Plaintiff's residual functional capacity ("RFC"), the state agency consultants found that Plaintiff's impairments could reasonably be expected to produce his pain or symptoms. The objective medical evidence was found to substantiate Plaintiff's statements about the intensity, persistence, and functionally limiting effects of his pain and symptoms. A.R. 158. Agency consultant Raymond Briski's physical RFC assessment, completed on July 15, 2011, found the following limitations: occasional lifting and/or carrying of 20 pounds, frequent lifting and/or

carrying of 10 pounds, standing, walking, and/or sitting for about 6 hours in an 8-hour workday, unlimited pushing and/or pulling, occasional climbing ramps/stairs, occasional climbing ladders, frequent balancing, occasional stooping, frequent kneeling, occasional crouching, and frequent crawling. A.R. 158–60. The mental RFC assessment, completed by consultant Monica Lintott on June 29, 2011, included "moderate limitations" in carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, working in coordination with or in proximity to others without being distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. A.R. 160–61. With regard to Plaintiff's social interactions, the RFC assessment found "moderate limitations" in accepting instructions and responding appropriately to criticism from supervisors and setting realistic goals or making plans independently of others. A.R. 161–62.

Lastly, the agency consultants found that Plaintiff did not have the ability to perform his past relevant work and was limited to light, unskilled work because of his impairments. A.R. 163–64. However, Plaintiff's limitations were found to "not significantly erode [his] occupational base." On July 29, 2011, the disability adjudicator/examiner Mark Simmons found Plaintiff to be "not disabled" based on the documented findings. A.R. 164.

At the reconsideration level in March 2012, the state agency consultants found that there had been no change in Plaintiff's illness or injury, no new physical or mental limitations, and no new illnesses, injuries, or conditions. A.R. 167. In addition to the evidence of record reviewed at the initial determination level, the consultants reviewed records from Saint Clare's Hospital, Cornerstone Physical Therapy, Newtown Memorial Hospital, New Jersey Endocrine Consultants,

Morris Heart Associates, Dr. Petrucelli, and Dr. Shah. A.R. 167–73. The consultants' findings of Plaintiff's medically determinable impairments of severity were unchanged. A.R. 174–75. Similarly, the physical and mental RFC assessments, completed by Pamela Foley on March 2, 2012, were largely unchanged, with the exception of two limitations: avoiding concentrated exposure to extreme cold and limited reaching of the left extremity in front, laterally, and overhead due to Plaintiff's partial tear of the left rotator cuff. A.R. 177. On reconsideration, the DDS concluded that Plaintiff, despite his combined impairments, could perform other work and was therefore not disabled. A.R. 182.

### C. Review of Testimonial Record

#### 1. Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified that his education consisted of high school and an electrical class. A.R. 125. He also indicated that he was in the Army reserve, had no children, and his wife was unemployed but received disability payments due to depression. *Id*. In response to a question about medical records referring to Plaintiff "doing work" after the onset date, Plaintiff explained that he had tried to fix his bathrooms at home, but his back pain and migraines led him to stop. *Id*.

Plaintiff testified that when he stopped working in 2011, he owned his own business, which had consisted of very few employees to manage the bookkeeping and scheduling. A.R. 126. As of the date of the testimony, Plaintiff's business had officially closed. *Id*. Plaintiff explained that he had been to the vocational rehab office, where he was told there was no work and was sent to Kessler Rehabilitation for an evaluation. *Id*.

At the time of the hearing, Plaintiff indicated that he was currently seeing (1) Dr. Arvary, his primary care physician; (2) Dr. Rosenfeld, an endocrinologist; (3) Dr. Nagendra, a neurologist and

pain management specialist; (4) Dr. Green, a neurologist; (5) Dr. Pinke, an ophthalmologist; and (6) Dr. Gaesser, a psychiatrist. A.R. 128. For his psychiatric problems, Plaintiff also testified to having seen Dr. Belgraves, Dr. Nelson, and Dr. Parigoris prior to Dr. Gaesser. A.R. 128–29. Plaintiff's only change to his medication list, which the ALJ had in her possession, was an antibiotic for Lyme disease. A.R. 129.

Plaintiff testified that his medication's side effects were primarily fatigue and occasional headaches. A.R. 129. Asked about a reference in the record that his headaches were getting less frequent, Plaintiff responded that the headaches were particularly bad during the month of the hearing, due to nervousness. *Id*. Plaintiff indicated that he typically suffered from four to five headaches per month, each lasting about forty-five minutes if he could "get into a dark, quiet room." A.R. 130. Furthermore, Plaintiff testified that his Relpax usually decreased the pain, but once or twice a month, the migraines would cause a sixth nerve palsy in his left eye. *Id*. Plaintiff described his headaches as feeling either like "knives in [his] temples" or "behind the eyes," the latter of which was worse and occurred once or twice a month. *Id*.

Plaintiff testified that as of the date of the hearing, he was only working at home and had no supervisors, contrary to a report referenced by the ALJ. A.R. 131. Plaintiff further indicated that he was hospitalized for testicular torsion, which required minor surgery, and for duodenal ulcer in the summer of 2011. *Id*. Additionally, he explained that he was hospitalized for spinal injections by Dr. Nagendra. A.R. 132.

Next, Plaintiff proceeded to explain his daily activities, which began when he arose near daybreak to take his thyroid medication, use the bathroom, and take care of his dog if his back and sciatica allowed. *Id*. Plaintiff testified that he would then take his Ritalin and lay back down until he felt better. *Id*. Depending on his level of fatigue, Plaintiff explained that he would get up for a

12

second time between 9:00 and 10:00 a.m. *Id*. On a "good day," Plaintiff testified that he would take the dogs out, maybe load and unload the dishwasher, make coffee, and attempt to do his physical therapy exercises comprised of stretches from bed and band therapy. A.R. 133. Plaintiff stated that he had between three and five "good days" per week, depending on the degree of his sciatica. *Id*.

In response to the ALJ's question about medical records indicating "overuse of [his] back" and "manual labor" in 2012, Plaintiff testified that his condition was due to attempting household chores, such as carrying laundry or wood, as well as driving. A.R. 134. Plaintiff explained that he suffered from dizziness, worse while standing, that felt like "tunnel vision" where "everything . . . fades away from [him]." A.R. 135.

Plaintiff further discussed that with respect to his organization skills, "[it is] hard" given his mental problems and ADD. *Id*.  Moreover, Plaintiff explained that Ritalin kept him calmer, improved his memory, and helped "somewhat" with the organization. *Id*. Plaintiff testified that he tried to do enjoyable activities such as painting art and writing a book "at least once or twice a week," although he could usually only write for "about 20 minutes to a half hour" until he fell asleep. A.R. 136. He further explained that he could no longer do hobbies that he used to enjoy. *Id*. Prior to his disability, Plaintiff would work on "projects," such as refurbishing a bathroom or putting in a sidewalk, which he could no longer do. *Id*. Plaintiff testified that he could shop but usually missed items on the list. A.R. 136–37.

Plaintiff testified that he wore reading glasses and had a prescription for distance vision, although his doctor did not want him to use them until the sixth nerve palsies were under control. A.R. 137. Plaintiff explained that in the 1990s, he visited his therapist, Dr. Christopher Wright, by himself. A.R. 137. However, Plaintiff further noted that when he met his wife Susan in "the late

1990s," she began to visit Dr. Wright, and Plaintiff would occasionally join their sessions. A.R. 138.

At the time of the hearing, Plaintiff testified that he could not walk "much more than ten minutes" before having to sit and stretch. A.R. 138–39. Plaintiff further discussed how sitting was "very uncomfortable," which resulted in him having to shift and stand frequently. A.R. 139. Plaintiff explained that he had little difficulty using stairs, but he preferred having a rail. *Id*. With regard to lifting and carrying, Plaintiff testified that he would take the dishes out of the dishwasher and restack them, and from time to time, he could make the bed. *Id*. Plaintiff noted that he could not take showers when his sciatica was "real bad," although he took "a few a week." *Id*.

Under questions from his counsel, Plaintiff testified that stress, bright light, and noise triggered his migraines. A.R. 140. On a "bad day," which occurred approximately half the month, Plaintiff explained that he would be in bed for "most of the day" and could not complete any chores. *Id*. At night, Plaintiff would try to go to sleep between 9:30 to 10:00 p.m., but he could never sleep through the night. *Id*. Plaintiff further stated that he often took naps for approximately an hour or more, a habit that started prior to him stopping working. A.R. 141.

Plaintiff indicated that he was seeing Dr. Gaesser for "depression, fatigue, and suicide." *Id*. Even with treatment and medication, Plaintiff continued to have thoughts of hurting himself and committing suicide, particularly when he realizes he cannot return to work. *Id*. With regard to the vocational rehab counselor Plaintiff consulted, he explained that in part due to his reading disabilities, she "had no ability to send me to school or . . . figure out a different job to do" other than his previous occupation. A.R. 142.

**2. Vocational Expert's Testimony**

Mr. Keeting, an impartial vocational expert ("VE"), also testified. To clarify Plaintiff's past work, Mr. Keeting questioned Plaintiff, who testified that he had previously restored bathrooms and kitchens, specifically installing tile, in a retirement community. A.R. 143–44. Mr. Keeting then defined the Plaintiff's past work as "carpentry work", which is "medium, skilled, SVP (Standard Vocational Preparation) of seven," an "electrician helper", which is "heavy, semiskilled, SVP of three," and "maintenance repairer", which is "medium, skilled, SVP of seven." A.R. 144.

The ALJ asked Mr. Keeting to assume the following hypothetical: "[A]n individual who has the same age, education and work experience as the claimant and has the residual functional capacity to perform work at a light exertional level as defined by the regulations . . . . [and who] can frequently kneel and crawl and balance, but only occasionally stoop, crouch and climb, with no ladders, ropes or scaffolds." A.R. 144–45. The individual had "no limitations with the right upper extremity and can frequent[ly] reach both overhead, back and forth with the left upper extremity . . . . [He] would need to avoid concentrated exposure to temperature extremes of cold, as well as wetness and hazards, such as moving machinery and unprotected heights . . . . [He] also would be limited to simple routine tasks with no complex tasks . . . . [He] would need to work in a low stress environment, defined as occasional decision making and occasional changes in the work setting." A.R. 145. The ALJ proceeded to ask whether that individual would be able to perform Plaintiff's past work, to which Mr. Keeting responded that he would not. *Id*. In response to Mr. Keeting's request to clarify the limitations, the ALJ instructed that the individual could frequently "balance, crawl, and kneel" but occasionally "stoop, crouch, and climb." A.R. 146.

Mr. Keeting testified that within the national economy, the individual could work as an "assembler of small products," which is "light, unskilled, SVP of two" and has approximately 50,000 to 60,000 jobs. *Id*. The individual could also work as a "marker, tagger, and labeler," which

is also "light, unskilled, SVP of two" but with 30,000 to 40,000 jobs in the national market. *Id*.
Mr. Keeting indicated that the individual could work as a "packer," which is "light, unskilled, SVP
of two" with 60,000 to 70,000 jobs. *Id*.

Upon questioning from the ALJ, Mr. Keeting testified that the hypothetical individual could
perform those jobs if he "was limited to occasional kneeling, crawling, and balancing, as well as
occasional pushing and pulling with the lower extremity . . . ." A.R. 146. The ALJ introduced new
limitations: "[T]he individual was further limited to no fast paced production work, such as specific
number quota work or conveyor belt work" but would be able to "complete their job" other than
"those types of situations." A.R. 147. Mr. Keeting answered that he "[thought] those jobs would
be intact." *Id*. Mr. Keeting further explained that "if the individual required an option where they
could transfer positions from a sit/stand throughout the workday," he would "rule out" the pricer,
but the packer was intact with 15,000 to 20,000 jobs. *Id*. The "assembler of small products" job
would likewise be intact, albeit with 30,000 to 40,000 jobs. *Id*.

However, if the individual "required work at the sedentary exertion level, with the
nonexertional limitations already provided throughout the hypotheticals," Mr. Keeting explained
that those jobs would no longer be intact. *Id*. Under those conditions, Mr. Keeting indicated that
the individual could work as a "surveillance monitor," which is "sedentary, unskilled, SVP of two"
and has 7,000 to 8,000 jobs. A.R. 148. He could also work as a "telephone receptionist," which is
"[s]edentary, unskilled, SVP of two" with 10,000 to 11,000 jobs or as an "assembler [of] small
products," which is "sedentary, unskilled, SVP of two" with 15,000 to 16,000 jobs. *Id*.
Mr. Keeting agreed with the ALJ that "if one limitation [was] actually not there, it [would not]
affect the ability to do that job." A.R. 148–49. Mr. Keeting then indicated that "if the individual
was off task more than [twenty] percent of the day for any reason, whether they needed additional

breaks or [would not] be able to sustain," that individual "would not be able to meet the demands of competitive employment" and would "require an accommodation by an employer to do so." A.R. 149.

Mr. Keeting was then questioned by Plaintiff's counsel, who asked whether there was "a minimum period of time for which the worker would need to maintain one or the other position" with respect to the "need to transfer positions from sitting and standing." *Id*. Mr. Keeting responded "not necessarily" and explained that rather than responding to the pain level, he was "responding to the functional operational standards of the job, which [one can] either sit or stand to perform it." *Id*.

The ALJ then asked whether "a limitation with regard to limited reading and writing requirements throughout the workday" with occasional verbal instruction would have an effect on the light level jobs, including assembler of small products, pricer, tagger, marker, and packer. A.R. 150. Mr. Keeting answered that it would not have an effect on the light level jobs nor the sedentary jobs of surveillance monitor, telephone receptionist, or assembler. *Id*. He then stated that his testimony was consistent with the *Dictionary of Occupational Titles* and his experience. *Id*.

*C. ALJ Findings*

The ALJ began by finding that Plaintiff met the insured status requirements of the Social Security Act ("SSA") to remain insured through December 31, 2015. A.R. 60. Next, the ALJ applied the standard five-step process to determine if Plaintiff had satisfied his burden of establishing disability. *Id*. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 15, 2011, the alleged onset date. *Id*. Second, the ALJ found that Plaintiff had the following "severe impairments:" status post resection of chordoma tumor of the basal skull via transnasal-transsphenoidal route, panhypopituitarism, attention deficit disorder/attention deficit

hyperactivity disorder, depressive disorder, dependent personality disorder, cognitive disorder, degenerative disc disease of the cervical and lumbar spine, and left shoulder tendinosis. *Id*. The ALJ noted that while Plaintiff had been diagnosed with hypertension, colitis, dumping syndrome, and diabetes mellitus, the record failed to show that those conditions cause any specific functional limitations, and therefore those impairments were non-severe. *Id*.

Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments under the SSA that would qualify for disability benefits. *Id*. The ALJ reviewed the medical evidence and requirements of the listings, including Sections 1.04, 12.02, 12.04, 12.06, and 13.00 et seq., and concluded that Plaintiff was not presumptively disabled. A.R. 61. The ALJ explained that the evidence did not document the specific findings required for listing severity. *Id*.

With respect to the Plaintiff's mental impairments, the ALJ found that their severity did not meet or medically equal the criteria of listings 12.02, 12.04, and 12.06, which involve organic mental disorders, affective disorders, and anxiety related disorders, respectively. A.R 61; *see* 20 C.F.R. Pt. 404, Subpt. P., App. 1. In making that finding, the ALJ considered the "paragraph B" criteria, which require that the mental impairments result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A.R. 61. The ALJ explained that a "marked limitation" is "more than moderate but less than extreme" and "[r]epeated episodes of decompensation . . . means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id*.

The ALJ found that Plaintiff had no restriction in activities of daily living, which include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using telephones and directories, and using a post office. *Id*. The ALJ further explained that it was necessary to "assess the quality of [those] activities by their independence, appropriateness, effectiveness and sustainability," as well as to the extent to which Plaintiff is capable of initiating and participating in independent and unsupervised activities. *Id*. She indicated that Plaintiff had a driver's license, drove once a week, could "prepare simple meals, shop for groceries, make the bed, load/unload the dishwasher and perform personal care activities at his own pace." *Id*.

Next, the ALJ found that Plaintiff had "moderate difficulties" with regard to maintaining social functioning, which refers to his "capacity to interact independently, appropriately, effectively and on a sustained basis with other individuals." *Id*. She explained that social functioning included "the ability to get along with others, such as family members, friends, neighbors, grocery clerks, land lords, and bus drivers." *Id*. Impaired social functioning can allegedly be demonstrated by a "history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships or social isolation," while strength in social functioning is illustrated by the ability to initiate social contacts, communicate clearly, or interact in group activities. *Id*. "Cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity" are also considered, as well as "interaction with the public, responding appropriately to persons in authority (e.g. supervisors), or cooperative behaviors involving co-workers." *Id*. Although Plaintiff isolated himself from others and preferred to be accompanied at doctor's appointments due to mental impairments, he was able to spend time with his wife, talk with family on the phone about once a week and e-mail them several times a week. *Id*.

The ALJ found that Plaintiff had "moderate difficulties" with regard to concentration, persistence, or pace, which refers to the ability to sustain focused attention and concentration "sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." A.R. 62. In making that determination, the ALJ noted that Plaintiff reported poor concentration and memory, that he must write things down to remember, he is slower completing tasks, and he understands verbal instructions more than written. *Id.*

Finally, the ALJ found no evidence to support a limitation with regard to episodes of decompensation of an extended duration, which are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace." *Id.* Therefore, the ALJ concluded that the "paragraph B" criteria were not satisfied because Plaintiff's mental limitations did not cause at least two "marked" limitations. *Id.* With respect to the "paragraph B" criteria, the ALJ clarified that the limitations identified are used to rate the severity of Plaintiff's mental impairments at steps two and three, rather than the more detailed assessment required for the mental residual functional capacity ("RFC") assessment used at Steps Four and Five. *Id.*

Next, the ALJ found that there was no evidence to meet the "paragraph C" criteria, which require Plaintiff to have a "medically documented history of chronic affective disorder of at least two years' duration that has caused more than minimal limitation on ability to do basic work activities with signs or symptoms currently attenuated by medical or psychosocial support, repeated episodes of decompensation or a complete inability to function independently outside the area of his home." *Id.*

20

In the fourth step, the ALJ found that Plaintiff had the RFC to perform light work under the SSA, but limited to "occasional balancing, stooping, crouching, crawling, kneeling and climbing but never on ladders, ropes or scaffolds." A.R. 63. Additionally, he could occasionally push and pull with lower extremities, had no limitations on the right upper extremity, and could frequently reach overhead and back and forth with the left upper extremity. *Id*. The ALJ found that Plaintiff "must avoid concentrated exposure to temperature extremes of cold, wetness, and hazards such as moving machinery and unprotected heights." *Id*. Furthermore, the ALJ described Plaintiff's ability as limited to "simple routine tasks but no complex tasks, in a low stress environment . . . [with] occasional decision making and occasional changes in the work setting." *Id*. Lastly, the ALJ found that Plaintiff could not perform fast-paced production work, but could occasionally read or write and ask for verbal instructions or directions. *Id*.

Noting Plaintiff's multiple impairments, the ALJ briefly described Plaintiff's testimony, including his subjective complaints, his daily activities, and his medications. A.R. 63–64. The ALJ also noted vocational rehabilitation counselor Erickson's letter, which concluded that Plaintiff would have great difficulty completing a training program. A.R. 64. After reviewing the evidence, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning intensity, persistence and limiting effects of these symptoms are not entirely credible." A.R. 64–65.

The ALJ indicated that the objective medical evidence did not support the alleged disabling conditions. A.R. 65. The ALJ then described the medical testimony. *Id*. In reaching her conclusion, the ALJ gave no weight to Ms. Erickson's report, because she is not a medical professional and therefore not an acceptable medical source, nor did the record describe what Ms. Erickson relied on for her decision. *Id*. Further, Plaintiff's focus improved following medications, and he had no

21

motor or sensory deficits. *Id*. The ALJ likewise gave no weight to the opinion of Heather Sleece, a physical therapist, because she initially claimed that Plaintiff could perform light work in an 8-hour day but later stated that Plaintiff could not. A.R. 67–68. The ALJ further noted Plaintiff's "self-limiting behavior" and failure to complete the treadmill test for the report. A.R. 68.

The ALJ also accorded no weight to the GAF score of 35 reported by Dr. Wright because the overall record did not support a finding that Plaintiff's mental impairments would cause major limitations in work, family relations, judgment or thinking. *Id*. While the ALJ gave some weight to the GAF score of 60 reported by Dr. Parigoris due to support by treatment history, she emphasized that Dr. Parigoris could not provide a medical opinion given that he is not a medical doctor, did not perform psycho-diagnostic testing, and had not observed Plaintiff outside the office. *Id*. With respect to GAF scores generally, the ALJ noted that there were no objective findings of observable functional limitations, nor had a medical provider set forth laboratory findings to support such an assessment. *Id*. Thus, the ALJ accorded little or no weight to either GAF score. *Id*.

The ALJ gave no weight to Dr. Arvary's form to the welfare department, in which he noted that the Plaintiff was disabled due to a spinal tumor, disc herniation, ADHD, and worsening cognitive functioning. *Id*. The ALJ explained that Dr. Arvary's opinion was inconsistent with his own records, and the ultimate issue of disability rests with the Commissioner. *Id*. She further noted that the orthopedic records described Plaintiff "doing quite a bit of manual labor," which is more than sedentary work. *Id*. In addition, the ALJ accorded no weight to Dr. Cullen's April 2011 opinion where he opined that Plaintiff "could not do any work" because a physical examination revealed "good power and tone of the upper and lower extremities," as well as unremarkable gait. *Id*.

Lastly, the ALJ gave "only partial weight" to Dr. Schulder's statement that he "advised the claimant to stop working due to physical stress." *Id*. Specifically, the exam showed that Plaintiff was "neurologically intact, and he had control of his chordoma." *Id*. The ALJ acknowledged that Plaintiff could not return to past work, but she noted that Dr. Schulder's advice to stop working altogether was not supported by the record. *Id*. The ALJ found the determinations of the conclusions of the non-examining medical/psychological consultants with the DDS to be consistent with the record.[2] A.R. 69.

With respect to her determination of the RFC, the ALJ noted that despite Plaintiff's testimony that he was "unable to do many activities," he testified that he painted, wrote, and completed manual labor in his own home. *Id*. Further, the ALJ recognized that the record showed "improvement with treatment," no reoccurrence of the tumor, and the ability to complete simple tasks. *Id*.

In Step Four, the ALJ found that Plaintiff is unable to perform any past relevant work based on the testimony of the VE and the documentary evidence of record. *Id*. Finally, considering Plaintiff's age, education, work experience, and RFC, the ALJ held that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. *Id*. The ALJ noted that if Plaintiff had the RFC to perform the full range of light work, a finding of "not disabled" would be required; however Plaintiff's ability to perform all the requirements of light work "has been impeded by additional limitations." A.R. 70. The ALJ described the VE's testimony that an individual with Plaintiff's limitations would be able to perform the requirements of "representative occupations" such as "assembler of small parts," "pricer/marker/tagger/labeler," and "packer." *Id*.

---

[2] The ALJ cites to the Disability Determination Explanations at the initial and reconsideration levels, which are described in detail *supra* at Part I(B). However, the record lacks any consultative examination by a state agency physician.

The ALJ therefore found that Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and that Plaintiff therefore "has not been under a disability, as defined in the Social Security Act, from January 15, 2011, through the date of this Decision." *Id.*

## II. Standard of Review

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

### III. Standard for Entitlement to Benefits

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id*. § 1382c (a)(3)(A)–(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id*. § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146–47 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146–47 n. 5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing,

pulling, reaching, carrying or handling." *Id*. A claimant who does not have a severe impairment is not considered disabled. *Id*. § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id*. § 404.1520(d); *see also Bowen*, 482 U.S. at 146–47 n. 5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id*. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, Step Three is not satisfied, and the claimant must prove at Step Four whether he or she retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141–42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at Step Five, that the "claimant is able to perform work available in the national economy." *Bowen*,

482 U.S. at 146–47 n. 5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id.*

## IV. Plaintiff's Claims on Appeal

### A. Step Three: ALJ's Evaluation of Listing Level Severity

At Step Three, Plaintiff alleges that the ALJ failed "to properly discuss or evaluate the listing level severity of the Plaintiff's individual and combined impairments."[3] Pl. Br. at 28. Specifically, Plaintiff argues that the ALJ failed to review listings (1) 1.04, for Plaintiff's two herniated cervical and lumbar discs, lumbar S1 radiculopathy, leg weakness, and motor, sensory, and reflex loss; (2)

---

[3]      Plaintiff fails to articulate his arguments in conjunction with the standard five-step process. Instead, Plaintiff structures his arguments in the following order: the ALJ (1) failed to discuss or evaluate Plaintiff's combined severe and non-severe impairments including clivus chordoma and mental impairments at Steps Two through Five; (2) failed to properly discuss the listing level severity of Plaintiff's individual or combined impairments; (3) erred in discrediting Plaintiff's subjective complaints; (4) erred in concluding that Plaintiff had the RFC to perform a limited range of light work; and (5) failed to meet her burden at Step Five. Pl. Br. at 1. However, the Court will structure its analysis step-by-step and, thus, will discuss Plaintiff's allegations with regard to the subjective complaints and objective medical evidence at the appropriate steps.

Further, while Plaintiff contends that the ALJ erred at Step Two in later arguments, Plaintiff does not contend that the ALJ failed to find that the Plaintiff demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. However, finding whether the claimant has demonstrated such impairments is all the ALJ must do at Step Two. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146–47 n.5. In fact, Plaintiff acknowledges that the ALJ found "numerous severe impairments" at Step Two, including the following, which Plaintiff simultaneously alleges were not properly discussed or evaluated: "status post resection of chordoma tumor, . . . attention deficit disorder/attention hyperactivity disorder, depressive disorder, dependent personality disorder, cognitive disorder, degenerative disc disease of the cervical and lumbar spine, and left shoulder tendinitis." Pl. Br. at 20–21; A.R. 60. Therefore, the Court construes Plaintiff's arguments as only relating to Steps Three through Five.

12.02, 12.04, 12.06, and 12.08, for Plaintiff's psychiatric and cognitive impairments with limitations; and (3) 13.11, for Plaintiff's clivus chordoma and residual symptoms. *Id.*

The Third Circuit has held that an ALJ must "set forth the reasons for his decision" and "fully develop the record and explain his findings" in Step Three, whereas a conclusory statement is "beyond meaningful judicial review." *Burnett v. Comm'r of Social Sec. Admin.*, 220 F.3d 112, 120 (3d. Cir. 2000) (remanding where the ALJ's conclusory statement in determining Step Three gave the court no way to review the ruling). While "*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis," *Jones*, 364 F.3d at 505, an "ALJ must clearly set forth the reasons for his decision." *Diaz v. Comm'r of Social Sec.*, 577 F.3d 500, 504 (3d. Cir. 2009) (remanding where the ALJ acknowledged a severe impairment but failed to meaningfully consider the claimant's impairment alone or in combination at Step Three). An ALJ can satisfy this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing." *Scatorchia v. Comm'r of Soc. Sec.*, 137 F. App'x 468, 471 (3d Cir. 2005).

**1. Section 1.04 Listing – Orthopedic Impairments**

First, Plaintiff contends that the ALJ failed to review whether Plaintiff met or equaled listing 1.04 with regard to his two herniated cervical and lumbar discs, lumbar S1 radiculopathy, leg weakness and motor, and sensory and reflex loss. Pl. Br. at 28. Specifically, Plaintiff alleges that in reviewing listing 1.04(A), Plaintiff has "herniated, degenerated lumbar and cervical discs, upper and lower extremity weakness, numbness, occasional hand shaking, generalized ankle weakness on the left, abnormal gait, sensory loss in the left lower extremity, lumbar and cervical

radiculopathy . . . . [and] involvement of two peripheral weight-bearing joints including the hip and knee." *Id*.

Section 1.04 pertains to "disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root . . . or the spinal cord." 20 C.F.R. § Pt. 404, Subpt. P., App. 1. A claimant must also meet the requirements of listing 1.04 Paragraphs A, B, or C to meet or equal the listing. *Id*. Listing 1.04(A) requires evidence of nerve root compression, characterized by " [1] neuro-anatomic distribution of pain, [2] limitation of motion of the spine, [3] motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by [4] sensory or reflex loss and, if there is involvement of the lower back, [5] positive straight-leg raising test (sitting and supine). *Id*. Paragraphs B and C, which require spinal arachnoiditis and lumbar spinal stenosis, respectively, are not relevant to the present case. *Id*.

Defendant asserts that Plaintiff fails to cite evidence of nerve root compression, which would allegedly end Plaintiff's argument at the outset. Def. Br. at 18. Specifically, Defendant alleges that Plaintiff's MRI merely indicates "possible mild broad herniation . . . with some foraminal impingement" and did not establish a compromise of a nerve root. *Id*. Defendant further argues that the remaining criteria of listing 1.04(A) are not satisfied because the record repeatedly shows that Plaintiff had no motor, sensory, or reflex loss. *Id*. at 19. Defendant notes multiple examinations demonstrating that Plaintiff had "full strength in his arms and legs, his motor strength was intact, he was neurologically intact, his reflexes were normal, he had no atrophy, he had full muscle strength, and he walked with a normal gait." *Id*. at 19. Finally, Defendant notes Plaintiff's "questionable" positive straight-leg raising test as a failure to a meet the fifth criterion, which he asserts is "fatal to [Plaintiff's] argument." *Id*. at 19.

A finding of nerve root compression requires evidence characterized by (1) neuro-anatomic distribution of pain, (2) limitation of motion of the spine, (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by (4) sensory or reflex loss and, if there is involvement of the lower back, (5) positive straight-leg raising test (sitting and supine). 20 C.F.R. § Pt. 404, Subpt. P., App. 1.

Here, the ALJ summarily concluded that upon reviewing Section 1.04's requirements and the relevant medical evidence, Plaintiff was not presumptively disabled. A.R. 61. Beyond one conclusory statement finding that Plaintiff's impairments did not meet or equal listing 1.04, the ALJ fails to explain or discuss the requirements in listing 1.04. *Id*. Upon review of the evidence, the Court finds that the record could support a finding that Plaintiff's impairments meet or equal listing 1.04, despite the ALJ's statement to the contrary. First, the evidence plainly supports a finding of "neuro-anatomic distribution of pain." [4] Dr. Scales diagnosed chronic cervical and thoracolumbar spine pain secondary to deconditioning, chronic partial tear of the left rotator cuff, and impaired function. A.R. 673. Orthopedist Dr. Polesin noted that Plaintiff had improved left lumbar radiculitis with discogenic and chronic back strain related to low back pain due to overuse. A.R. 671. Following Plaintiff's complaints of left hip pain with numbness radiating down his left leg, numbness in his left arm into his fingers, subacute pain in his right knee, Dr. Petrucelli diagnosed mild multilevel degenerative disc disease, facet arthropathy, C5-6 concentric disc bulge, mild disc bulging at both L3-4 and L4-5, and uncovertebral hypertrophy causing at least mild bilateral neuroforaminal narrowing without significant spinal canal stenosis. AR. 609–14.

---

[4] While Defendant correctly indicates in its opposition brief that listing 1.04 requires a finding of nerve root compression, the listing requires "evidence of nerve root compression" *characterized by* the remaining criteria discussed *supra*. 20 C.F.R. § Pt. 404, Subpt. P., App. 1. Defendant misconstrues the listing level criteria when alleging that the lack of an explicit finding of nerve root compression leads Plaintiff to "fail out the outset." Def.'s Br. at 19.

However, the record holds conflicting evidence as to whether Plaintiff had limitation of motion, motor loss, sensory or reflex loss, or a positive straight leg-raising test. In April 2011, Dr. Greene noted that Plaintiff had "good power and tone in the upper and lower extremities." A.R. 595–97. Further, Dr. Polesin found no significant range of motion restrictions, normal muscle tone and full strength in key muscle groups, as well as negative straight leg raise. A.R. 781. On the other hand, Dr. Arvary reported that Plaintiff exhibited sensory deficit of the lower extremities. A.R. 745–46. In a later report by Dr. Polesin, she notes that Plaintiff demonstrated "mild restriction in hyperextension," indicating limitation of motion. A.R. 781. Dr. Petrucelli also noted restriction of motion in his cervical spine, weakness to an abduction force in his shoulder at ninety degrees, and some "questionably positive" straight leg-raising. A.R. 609.

In the ALJ's decision, though not specifically in her Step Three analysis, she noted some evidence in support of her finding that Plaintiff's impairments did not equal or meet the listing 1.04. She indicated the following orthopedic findings: "good power and tone of the upper and lower extremities . . . . [Plaintiff's] gait was unremarkable . . . . Plaintiff had "full range of motion of the right hip, . . . . restriction of motion in his cervical spine, weakness to an abduction force in his shoulder at ninety degrees, and some 'questionably positive' straight leg raising, . . . . some tenderness in the left hip but full range of motion and no swelling, . . . . no motor, sensory or gait abnormalities, [and] . . . . good motion of the back with mild pain to range of motion and good motion of the hips without pain." A.R. 65–66.

However, the ALJ failed to "set forth the reasons for [her] decision" or "fully develop the record and explain [her] findings," thus failing to meet the *Burnett* and *Diaz* standards. Had the ALJ explained her findings, the contradictory relevant medical evidence may have substantiated her decision; however, this Court is unable to make that determination and indeed finds there is at

least some evidence in the record supporting Plaintiff's contention. Because this Court cannot determine whether the ALJ's deficient conclusory statement detracts from the ALJ's ultimate determination, remand is warranted to reassess Plaintiff's orthopedic impairments in connection with Section 1.04's listing level requirements.

**2. Sections 12.02, 12.04, 12.06, and 12.08 – Mental Impairments**

Next, Plaintiff asserts that the ALJ failed to review listings 12.02, 12.04, 12.06, and 12.08 for Plaintiff's psychiatric and cognitive impairments in "daily living," "social functioning" and "concentration, persistence, and pace." Pl. Br. at 28. Despite the ALJ finding "severe" impairments at Step Two, Plaintiff alleges that the ALJ erred in concluding that he did not meet the Paragraph B criteria. *Id.* at 29. With regards to limitations in "maintaining social functioning," Plaintiff notes Dr. Wright's conclusions that Plaintiff had "trouble dealing with others[,] defiance in taking instructions from others, and difficulty interacting with supervisors." *Id.* Plaintiff further describes psychological tests revealing "anger, irritability and unusual talking," as well as his wife's supplemental letter, which was not part of the ALJ's record. *Id.*

A claimant's organic, affective, anxiety-related, or personality disorder meets or medically equals listing 12.02, 12.04, 12.06, or 12.08, respectively, when it either satisfies both the Paragraph A and Paragraph B criteria, or satisfies the Paragraph C criteria of that listing. 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.02–12.08. Here, the ALJ found that Plaintiff's mental impairments did not meet listings 12.02–12.08, focusing primarily on her assessment of Plaintiff's disorders in conjunction with the Paragraph B criteria. A.R. 61–62.

To satisfy the Paragraph B criteria of listings 12.02–12.08, a claimant must demonstrate that his disorder results in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in

maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.02–12.08. A limitation is "marked" when it is "more than moderate but less than extreme." *Id*. "Marked" limitations may arise when several activities or functions, or even one, are impaired, "as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1). The ALJ may find a marked limitation in a claimant's daily activities "if [he has] serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions." *Id*. Here, the ALJ found that Plaintiff's disorders did not result in marked limitations in any of the first three categories, and that Plaintiff did not have any repeated episodes of decompensation.[5] A.R. 61–62.

a.   Daily Living

With respect to Plaintiff's activities of daily living, the ALJ concluded that Plaintiff's mental impairments resulted in "no restriction." A.R. 61. In support of her conclusion, the ALJ noted that Plaintiff reported he could prepare simple meals, shop for groceries, make the bed, load/unload the dishwasher and perform personal care activities at his own pace. *Id*. She also noted that Plaintiff had a driver's license and drove about once a week. *Id*.

Plaintiff cites his wife's report, included in the record, that he could not live independently and needed daily supervision. A.R. 20. With respect to the letter written by Plaintiff's wife, information from nonmedical sources can be used only "to supplement the record of [a claimant's] functioning in order to establish the consistency of the medical evidence and longitudinality of impairment

---

[5] Plaintiff does not dispute the ALJ's finding that he did not have any repeated episodes of decompensation.

severity." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(1)(c). While Plaintiff offers some objective evidence to support his wife's conclusion that Plaintiff could not live independently or needed daily supervision, this Court gives little weight to her letter given that it was written subsequent to the ALJ's hearing.

However, Plaintiff provides substantive evidence in support of his contention that his activities of daily living are limited in some way. In his testimony, Plaintiff noted that on "bad days," which were at times half the month and caused him to stay in bed "most of the day," he could not perform several daily activities, such as taking the dogs out, loading/unloading the dishwasher, or making the bed. A.R. 133–40. Furthermore, Plaintiff explained that he could not take showers on occasions when his orthopedic pain was too severe. A.R. 139. At his physical therapy sessions, Plaintiff reported severe difficulty or inability to push open a heavy door, do heavy household chores, make a bed, carry a heavy object, wash or blow dry his hair, or put on a pullover sweater. A.R. 644. On the other hand, the ALJ based her finding that Plaintiff had "no restrictions" in his activities of daily living on Plaintiff's reports that he could occasionally "prepare simple meals, shop for groceries, make the bed load/unload the dishwasher, and perform personal care activities at his own pace." A.R. 61.

Activities of daily living include "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(C)(1). Even if a claimant performs a wide range of activities of daily living, the Agency "may still find that [the claimant has] a marked limitation in [his] daily activities if [he has] serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions. *Id*. In determining how a

34

claimant's established impairments affect their activities of daily living, the ALJ must consider all relevant evidence in the case record, including medical evidence, information from the individual, and other information, including evidence from other health care professionals and nonmedical sources. *Id*. § 12.00(D)(1)(a)–(c).

Here, this Court finds that that the ALJ failed to adequately consider all relevant evidence in the case record and did not offer substantial evidence in support of her conclusion that Plaintiff had no restrictions in his activities of daily living. First, the Disability Determinations at the initial and reconsideration levels, whose conclusions the ALJ found consistent with the substantial evidence of record, both found that Plaintiff had at least "moderate" restrictions in his activities of daily living. A.R. 158, 175. While the ALJ is not bound by "opinion evidence" of non-examining consultants, the ALJ's explanation in support for her finding of no restrictions was insufficient for meaningful review. *See* 20 C.F.R. § 404.1527(e). The ALJ also failed to consider the evidence from Cornerstone Physical Therapy, where Plaintiff reported severe difficulties and inabilities in several activities of daily living. Further, the ALJ erred in considering only limited portions of Plaintiff's testimony, excluding his having frequent difficulty with grooming and hygiene, household chores, shopping, paying bills, cleaning, and maintaining a residence, all of which are defined as activities of daily living. *Id*. § 12.00(I)(6); A.R. 133–40. In light of the foregoing evidence, the ALJ's failure to adequately consider relevant evidence and provide a satisfactory explication of her decision warrants remand, to further assess Plaintiff's restrictions in activities of daily living.

    b.  Social Functioning

The ALJ next concluded that Plaintiff had only "moderate difficulties" in maintaining social functioning. A.R. 61. In support of her conclusion, the ALJ noted that Plaintiff was able to spend

time with his wife, talk with family on the phone about once a week, and e-mail members of his family multiple times per week. *Id*. The ALJ did acknowledge that Plaintiff isolated himself from others due to his mental impairments and preferred to have someone accompany him to doctor appointments. *Id*. In assessing Plaintiff's social functioning, the record shows that the ALJ provided substantial evidence in support of her conclusion that Plaintiff had only a moderate difficulties. *See e.g.*, *Garcia v. Astrue*, No. 11–113, 2012 WL 2018240 at *8 (W.D. Pa. June 5, 2012) (affirming an ALJ's decision to find moderate difficulties in maintaining social functioning where the claimant had shown "some indication of social isolation [and] was able to maintain satisfactory relationships with his brother and others, and . . . health care professionals). Like in *Garcia*, the Plaintiff here has shown some indication of social isolation but also that he is still able to maintain satisfactory relationships with family. Therefore, the ALJ's determination that Plaintiff only had moderate difficulties in social functioning is based in substantial evidence.

      c.   Concentration, Persistence, or Pace

    The ALJ also concluded that Plaintiff had only "moderate difficulties" in maintaining concentration, persistence or pace. A.R. 62. The ALJ acknowledged Plaintiff's poor concentration and memory, his necessity to write things down to remember, and his slowness in completing tasks. *Id*. The ALJ also noted that Plaintiff was able to understand verbal instructions more than written instructions. *Id*. Plaintiff argues that "he has documented marked/severe difficulties" with support from Dr. Wright's findings that Plaintiff had poor attention and concentration, as well as substandard productivity, poor time management, and poor organization. Pl. Br. at 29. Plaintiff further notes Dr. Parigoris' opinion that Plaintiff was "confused easily," would have difficulty working at a fast pace, and had difficulty maintaining attention for prolonged periods of time. *Id*. Plaintiff refers the Court to his results on the Connors ADD Scale, measured by Drs. Hausler and

Hodgkiss, which were in the "clinically elevated range" in the "inattention/memory problems," "hyperactivity/restlessness," and "impulsivity/emotional liability" measures. A.R. 353–54; Pl. Br. at 29. Plaintiff draws support from Dr. Cullen's assessment that Plaintiff had cognitive difficulty, as well as memory and concentration deficits. Pl. Br. at 20. Plaintiff notes Dr. Arvary's opinion that Plaintiff's cognitive disorder limited his ability to concentrate and thus rendered Plaintiff unable to work. *Id*. at 30. Lastly, Plaintiff also refers the Court to Dr. Gaesser's opinion that Plaintiff "would not be able to stay focused." *Id*.

Defendant argues that Plaintiff could concentrate long enough to watch television, use a computer, paint artwork, and write books. Def. Br. at 20. Further, Defendant notes that Plaintiff testified to having improvement with focusing due to Ritalin. *Id*. Defendant indicates that Plaintiff erred in relying on notes of Drs. Wright, Arvary, Gaesser, and Ms. Wilson, all of whom were not fully credited by the ALJ given their conflicts with substantial evidence. Def. Br. at 21.

While concentration, persistence, and pace are best observed in work settings, "major limitations in this area can often be assessed through clinical examination or psychological testing." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3). Even if a claimant can complete many simple tasks, the Agency may nevertheless "find that you have a marked limitation in concentration, persistence, or pace if [he] cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions." *Id*.

In light of the evidence as a whole, this Court finds that the ALJ failed to offer substantial evidence in support of her conclusion that Plaintiff had only "moderate difficulties." Rather than cite to objective medical evidence or even opinion evidence, the ALJ merely cited Plaintiff's

ability to understand verbal instructions more than written instructions. The ALJ failed to refer to

Drs. Hauser and Hodgkiss' psychological testing, which revealed "clinically elevated" levels in

connection to Plaintiff's limitations in maintaining concentration, persistence, and pace. With

respect to Drs. Wright and Arvary, both of whom were treating physicians, while the ALJ assessed

their credibility and discredited specific evidence when determining Plaintiff's RFC, as discussed

*infra* at Part IV(B)(1)(b), the ALJ did not consider their relevant medical evidence when she

reviewed listings 12.02, 12.04, 12.06, and 12.08. Thus, the ALJ's failure to adequately consider

relevant evidence and provide a satisfactory explication of her decision warrants remand, to further

assess Plaintiff's limitation in maintaining concentration, persistence, and pace.

### 3. Section 13.11 — Chordoma

Lastly, Plaintiff alleges that the ALJ failed to review Listing 13.11 for clivus chordoma, with

"fatigue, left residual left sided weakness, migraine headaches and upper extremity limited fine

manipulative ability as documented on testing." *Id*. at 28. To qualify for Listing 13.11, Plaintiff

must establish sarcoma (1) that was inoperable or unresectable; (2) with recurrent tumor (except

local recurrence) after initial antineoplastic therapy; (3) with distant metastases; or (4) all other

tumors originative in bone with multimodal antineoplastic therapy, in which the residual

impairments must be evaluated under the criteria for the affected body system. 20 C.F.R. Pt. 404,

Subpt. P., App. 1, § 13.11.

Plaintiff contends that his chordoma with post surgery and radiation therapy residuals meets

or equals Listings 13.11, despite being in remission. Pl. Br. at 30. Plaintiff notes his documented

left side paresis with numbness and weakness in the left upper and lower extremity, weakness,

tremors, migraines, cognitive disorder, organic brain disorder, visual impairment with sixth nerve

palsy, episodes of dizziness, imbalance, abnormal gait, hypothyroidism, pain hypopituitarism, and severe fatigue and depression. *Id.*

Plaintiff fails to establish how his clivus chordoma or residual symptoms meets or equals the requirements for 13.11. Plaintiff's sarcoma was (1) operated on six years before his alleged disability onset date, (2) had not recurred, and (3) was not with distant metastases. A.R. 455, 596–97, 803. Moreover, Plaintiff's neurologist indicated that he had "control of" his clivus chordoma. *Id.* Therefore, the ALJ's finding that Plaintiff's condition did not meet or equal Listing 13.11 is supported by substantial evidence.

**B. Step Four – ALJ's Determination of Plaintiff's Residual Functional Capacity**

**1. ALJ's Evaluation of Medical Evidence**

Next, Plaintiff contends that the ALJ failed to properly discuss or evaluate Plaintiff's "documented combined severe and non-severe impairments including [c]livus [c]hordoma and symptoms, pain, cognitive disorders, and mental impairments at Steps 2–5 . . . ."[6] Pl. Br. at 20. Given that Plaintiff does not specifically allege how the ALJ erred at Step Two, the Court construes Plaintiff's argument as the ALJ's failure to properly weigh the medical evidence with respect to determining Plaintiff's residual functional capacity at Step Four.[7]

---

[6] Here, Plaintiff contends that the ALJ erred at Step Two in this argument, but as discussed *supra* at Part IV(A), Plaintiff does not contend that the ALJ failed to find that the Plaintiff demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities; finding whether the claimant has demonstrated such impairments is all the ALJ must do at Step Two. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146–47 n.5. Therefore, the Court construes Plaintiff's argument here as only relating to Step Four. *See supra* note 3.

[7] Plaintiff also contends that his subjective complaints including pain must be considered in Steps Two through Five. Pl. Br. at 20–21. With respect to Plaintiff's subjective complaints, a review of the ALJ's credibility of the Plaintiff can be found *infra* at Part IV(B)(2).

"In making a residual functional capacity determination, the ALJ must consider all evidence before him," and must "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 120. Ultimately, "[w]here the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (2012). When looking at the medical testimony, an ALJ must give a treating physician's opinion controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(c)(2). The ALJ may also consider other factors, such as the "amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has." 20 C.F.R. § 404.1527(c)(6). If, however, a treating physician's opinion conflicts with that of a non-treating physician, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reasons." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). That is, the ALJ must rely only on "contradictory medical evidence" in rejecting the treating physician's opinion, rather than "credibility judgments, speculation or lay opinion." *Id*.

### a. Clivus Chordoma, Radiculopathy, and Secondary Symptoms

First, Plaintiff claims that the ALJ failed to discuss or evaluate Plaintiff's bone sarcoma residual and radiation therapy symptoms, which he alleges must be considered "at all steps of the sequential evaluation process." Pl. Br. at 22. Plaintiff alleges the following symptoms secondary to the chordoma and radiation therapy: "upper extremity numbness, weakness, shaking in arms and hands, migraine headaches, cognitive disorders/organic brain disorder, visual impairments/diplopia, episodes of dizziness and nausea, light and sound sensitivity, fatigue, low

40

energy, generalized muscle weakness, abnormal gait, inability to stand or walk greater than 5 minutes, left leg weakness, limited sitting or standing greater than 10–15 minutes, pan hypopituitarism, hypothyroidism (damage from the radiation) and position dysfunction." *Id.*

In support of this argument, Plaintiff seeks to introduce multiple medical "treatises" outside of the administrative record to supplement the medical evidence of Plaintiff's chordoma and radiation therapy secondary symptoms. *Id*. at 6. Among the evidence submitted are treatise articles from *Chordoma Foundation*, *Indiana University Health Proton Therapy Center*, *Medscape Reference, 2011 WebMD*, from *St. John's Health Center*, and *Journal of Medical Case Reports*. Pl.'s Reply Br. at 1–2. Plaintiff argues that the treatises are "critical" to understanding the clivus chordoma and proton radiation therapy, as well as Plaintiff's residuals. *Id*. at 2. Defendant contends that the exhibits are not part of the administrative record and "are ultimately . . . irrelevant to Plaintiff's claims in this case." Def.'s Br. at 1.

The Court construes Plaintiff's submission of additional evidence to be a request for the ALJ to consider new evidence. "The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." 42 U.S.C. § 405(g) (1997). "New evidence" has been interpreted as evidence not merely reiterating past findings through new sources, but, rather, evidence that either raises new issues or clarifies existing ones. *See Cruz-Santos v. Callahan*, No. CIV.A. 97-439, 1998 WL 175936, at *2 (D.N.J. Apr. 7, 1998), (citing *Szubak v. Secretary of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984) (*per curiam*)). The new evidence must also be material and should therefore "shed light upon the case in a relevant manner to the extent that there is a 'reasonable possibility that the new evidence would have changed the outcome of the Secretary's

determination.'" *Id.* (quoting *Szubak*, 745 F.2d at 833). Lastly, the Plaintiff must show good cause for failing to incorporate the evidence into prior proceedings. *See id.* (citing *Szubak*, 745 F.2d at 833.

Plaintiff's additional evidence meets the first standard of being "new." That is, the medical "treatises," only one of which appears to be peer-reviewed, provide additional and clarifying information about Plaintiff's alleged conditions, particularly his clivus chordoma and the radiation therapy. However, I do not find the new evidence to be "material," because the treatise articles are unlikely to have changed the outcome of the ALJ. Plaintiff emphasizes that the treatise articles support Plaintiff's subjective symptoms such as "headaches, neck pain, neurological changes, cranial nerve palsies, paralysis or weakness of facial muscles, diplopia, weakness, [and] tingling . . . ." In fact, the ALJ noted that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," and only discredited the Plaintiff with respect to their "intensity, persistence, and limiting effects," which the new evidence does not clarify. A.R. 64–65. The new evidence merely supports existing evidence that Plaintiff in fact does suffer from the residual symptoms he alleges, symptoms which the ALJ deemed "could reasonably be expected to" result from Plaintiff's impairments. *Id.* Without clarifying how the new evidence would likely have changed the outcome of the ALJ's decision, Plaintiff fails to explain how the evidence is material, and, as such, the Court must exclude Plaintiff's submissions.

Further, Plaintiff's assertion that the ALJ failed to discuss or evaluate his bone sarcoma and residual symptoms is baseless. The ALJ explicitly referenced each of the symptoms that Plaintiff alleges were neglected throughout Steps Two through Five. A.R. 63–67. However, with regard to the intensity, persistence and limiting effects of these symptoms, the ALJ's assessment of Plaintiff's subjective complaints is reviewed *infra* at Part IV(B)(2).

### b. Mental Impairments

Plaintiff acknowledges that, while the ALJ noted that Plaintiff's mental impairments including depressive disorder, anxiety disorder, personality disorder, and ADHD were all "severe impairments" at Step Two, the ALJ discredited the findings of "all treating and consulting medical sources and further attacked and discredited the Plaintiff's credibility." Pl.'s Br. at 22. Plaintiff contends that the ALJ failed to take into consideration medical evidence of Plaintiff's "fatigue, or psychiatric impairments including personality disorder, ADHD and anxiety." *Id*. at 23. While Plaintiff broadly argues that the ALJ failed to fully account for Plaintiff's mental impairments throughout the five-step analysis, and I did consider Plaintiff's mental impairments in my review of Step Three, *supra*, the bulk of this argument appears to pertain to Step Four because Plaintiff appears to assert that his mental impairments should have been further considered in the ALJ"s RFC assessment.

Plaintiff alleges that the ALJ failed to provide a basis for why she reached her conclusions about Plaintiff's mental impairments, which were different "from those of all treating and consulting psychologists and vocational consultants." *Id*. at 26. Plaintiff further asserts that the ALJ failed to consider Plaintiff's "nonexertional limitations including . . . time management, organizing, low productivity, tardiness and excessive absences, severe limitations in social interaction, poor focus, attention and concentration, no contact with the public and limited contact with supervisors or co-workers, need for supervision and side effects of medications." *Id*. Plaintiff also argues that the ALJ erred in concluding Plaintiff's limitations in social functioning to be "moderate," given Dr. Arvary's opinion that Plaintiff's ability to maintain attention, concentration, persistence or pace was "severely limiting." *Id*. Plaintiff refers the Court to evidence from Mr. Smith and Ms. Erickson of the DVS, as well as the New Jersey Work First Program, who found

Plaintiff unable to work. *Id*. Further, Plaintiff introduces his wife's letter, which states that he could "not function without supervision," in support of his argument. *Id*. Plaintiff asserts that Drs. Hodgkiss and Hauser concluded that Plaintiff's mental impairments would interfere with work. *Id*. at 24. He further describes Dr. Wright's findings, which include Plaintiff's alleged poor concentration and attention, trouble due to defiance and poor compliance, difficulty interacting with supervisors, and substandard productivity. *Id*. Finally, Plaintiff refers the Court to Dr. Parigoris, Psy.D., who concluded that Plaintiff "would have difficulty maintaining attention for prolonged periods of time" and had a "relative low stress tolerance level." *Id*. at 24–25.

First, the ALJ accorded "no weight" to the opinions of Ms. Erickson, a vocational rehabilitation counselor, because Ms. Erickson is not a medical professional and therefore not an acceptable medical source. A.R. 67. Further, the ALJ noted that the record did not specify what Ms. Erickson relied on to make her findings. *Id*. Under regulations promulgated by the Social Security Administration ("SSA"), a vocational rehabilitation counselor is not an "acceptable medical source" to "provide evidence to establish an impairment." *See* 20 C.F.R. §§ 416.913(a), 404.1513(a). Instead, a vocational rehabilitation counselor's opinion is an "other source," which "may be used to show the severity of [a claimant's] symptoms and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d). A 2006 policy interpretation ruling from the SSA notes,

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06–3p, *Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies* (SSA 2006); *see also, e.g.*, *Forcinito v. Comm'r of Soc. Sec.*, No. CIV. 12–6940 JBS, 2014 WL 252095, at *6 (D.N.J. Jan. 23, 2014). Here, the ALJ satisfactorily explains the lack of weight given to Ms. Erickson's opinion in light of the ALJ's inability to determine what Ms. Erickson relied on in her determination, as well as Ms. Erickson's status as an "other source." [8]  A.R. 286. Because Ms. Erickson's opinion evidence is not an "acceptable medical source" but instead an "other source," the ALJ was merely bound to explain the weight given to Ms. Erickson's findings, which the ALJ did sufficiently in her opinion.

Plaintiff next asserts that the ALJ erred in discrediting "most of the findings and opinions and testimony as to functioning level in reaching her conclusion." Pl. Br. at 24. The ALJ gave no weight to a December 2011 Examining Physician's Report filled out by Dr. Arvary, Plaintiff's treating physician, which stated that Plaintiff was limited in all function and disabled, and was provided to the Department of Human Services' Division of Economic Assistance. A.R. 68, 744–49. The ALJ found the opinion "inconsistent with his own records," as well as with orthopedic records in 2012 indicating that Plaintiff was "doing quite a bit of manual labor." *Id*. The ALJ also discounted the assessment of Plaintiff's GAF score of 35 by Dr. Wright, Plaintiff's treating psychologist, because the "overall record [did] not support a finding that the claimant's mental impairments would cause major limitations in several areas, such as work, family relations, judgment or thinking." *Id*.

---

[8] In a letter dated February 12, 2013, Ms. Erickson indicated that she had reviewed "all of the records received in [Plaintiff's] application for Vocational Rehab Services," but she fails to identify specifically what records were included.

Under 20 C.F.R. § 404.1527(c)(2), a treating physician's opinion will be given controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." *Id*. Additional factors to be used to determine the weight given to a medical opinion include, *inter alia*: length of treatment relationship, the nature and extent of the treatment relationship, supportability by medical evidence, and consistency with the record as a whole. *Id*. If a treating physician's opinion conflicts with that of a non-treating physician, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reasons." *Morales*, 225 F.3d at 317. That is, the ALJ must rely only on "contradictory medical evidence" in rejecting the treating physician's opinion, rather than "credibility judgments, speculation or lay opinion." *Id*. An ALJ is required to provide "an explanation of the reasoning behind [her] conclusions," including "reason(s) for discounting" rejected evidence. *Fargnoli v. Massanari*, 247 F.3d 34 (3d. Cir. 2001).

The record supports the ALJ's decision to give no weight to Dr. Arvary's report. A.R. 25. Dr. Arvary's report found that Plaintiff was "limited in all function" due to disc herniation, attention deficit disorder, and worsening cognitive function. A.R. 68. However, Dr. Arvary's other reports contradict this finding by indicating that Plaintiff exhibited "no motor, sensory or gait abnormalities" in July 2012 and "had been doing a lot of manual physical labor" in January 2012. A.R. 66. Dr. Arvary had also reported that physical examination "revealed good motion of the back with mild pain to range of motion and good motion of the hips without pain." *Id*. This Court cannot "re-weigh the evidence or substitute its judgment for that of the ALJ," so we must "uphold the ALJ's decision even if there is contrary evidence that would justify the opposite conclusion, as long as the 'substantial evidence' is satisfied." *Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x 199, 201 (3d Cir. 2012) (citing *Burns v. Barnhart*, 312 F. 3d 113, 118 (3d. Cir. 2002)). The ALJ's

"explanation of the reasoning behind [her] conclusions" to accord no weight to the report relies on "contradictory medical evidence" and is thus based in substantial evidence. *Morales*, 225 F.3d at 317.

Likewise, the ALJ's decision to assign no weight to Dr. Wright's May 2011 report of Plaintiff's GAF score of 35 appropriately relies on contradictory medical evidence. The ALJ noted that in June 2011, Dr. Parigoris, Plaintiff's treating psychologist from July 2010 through the date of the initial determination, reported a GAF score of 60, which the ALJ indicated was supported by a history of treatment. A.R. 68. Although Dr. Wright was Plaintiff's treating psychologist, the ALJ did provide an explanation of her reasoning and relied on contradictory medical evidence, thus making her decision based in substantial evidence. A.R. 68.

Despite the little-to-no weight given to Drs. Wright and Arvary's reports, the ALJ nevertheless found that Plaintiff experienced some mental limitations and limited Plaintiff's RFC to accordingly. A.R. 63. With respect to purported social interaction problems, the ALJ limited Plaintiff's RFC to unskilled work, where he would be "dealing primarily with objects rather than . . . people." SSR 85-15, 1985 WL 56857, at *4 (SSA). Further, the ALJ limited Plaintiff's RFC to simple, routine tasks in a low-stress environment, without any fast-paced production work or number quota work. A.R. 63. To account for Plaintiff's cognitive difficulties, the ALJ limited his RFC to occasional reading and writing and adding, as well as the ability to ask for verbal instructions if needed. *Id.* Therefore, the ALJ incorporated Plaintiff's mental limitations and, overall, the ALJ's conclusions about and evaluations of Plaintiff's mental impairments were based in substantial evidence.

### c. Orthopedic Impairments

Plaintiff asserts that the ALJ failed to evaluate Plaintiff's orthopedic and pain limitations in determining whether he was "capable of returning to a standing or seated job, or a job requiring repetitive arm or hand motion, reaching, gripping, grasping, or fingering." *Id*. at 28. In support of his argument, Plaintiff refers the Court to his testimony that he was unable to sit or stand for an extended period of time, use his left arm for most physical activities, that he left work due to orthopedic impairments, and that he could walk for up to 10 minutes and sit for a short time before becoming uncomfortable. *Id*. Plaintiff alleges that the ALJ failed to "fully or fairly develop" Plaintiff's orthopedic impairments and secondary pain at Steps Two through Five. *Id*. Plaintiff relies on opinions of Dr. Cullen, who reported that Plaintiff could stand for no longer than ten minutes and could not do any work. A.R. 592–93.

Defendant argues that the ALJ "reasonably evaluated all of Plaintiff's orthopedic impairments." Def. Br. at 15. While the ALJ recognized some functional limitations stemming from Plaintiff's orthopedic conditions, Defendant further asserts that the objective medical evidence established that he had "a normal gait, . . . full strength and tone in his lower and upper extremities,  . . . symmetrical deep tendon reflexes, . . . full range of motion [in his left hip], . . . and tenderness in his spine and good motion in his back." *Id*. Therefore, Defendant alleges that the ALJ "reasonably accounted for Plaintiff's credible functional limitations by restricting him to a range of light work," including limited balancing, stooping, and crouching, as well as limited pushing and pulling. *Id*. at 16.

With regards to Dr. Cullen's opinion, the ALJ relied on contradictory medical evidence when deciding to accord it no weight. Specifically, the ALJ noted that Plaintiff's physical examination, conducted by Dr. Green in April 2011, revealed good power and tone of the upper extremities, and

48

that Plaintiff's gait was unremarkable. A.R. 68, 595. Therefore, the ALJ provided a reasoned explanation, which was based in substantial evidence.

Further, Plaintiff's assertion that the ALJ failed to discuss his orthopedic and pain limitations with respect to the ALJ's RFC determination is contrary to the record. In fact, the ALJ accounted for Plaintiff's functional limitations by restricting him to only occasional balancing, stooping, crouching, crawling, kneeling, and climbing, only occasionally pushing and pulling with his legs, and only frequently reaching overhead with his left arm. A.R. 63. With respect to the Plaintiff's subjective complaints, the ALJ justifiably discredited Plaintiff's testimony as to the "intensity, persistence and limiting effects of [his] symptoms" as discussed *infra* at Part IV(B)(2). Therefore, the ALJ's findings are based in substantial evidence.

### 2. ALJ's Failure to Properly Evaluate Plaintiff's Credibility

Next, Plaintiff alleges that the ALJ erred at Step Four by discrediting Plaintiff's subjective complaints, including pain, therefore rendering the RFC assessment incomplete. *Id*. at 30. Specifically, Plaintiff contends that the ALJ failed to properly evaluate Plaintiff's complaints of "leg pain numbness and weakness, migraine headaches, visual impairments and blurriness during migraine headaches attacks, multiple joint and back pain with difficultly sitting, standing, walking or bending, bilateral wrist and bilateral hand weakness with poor fine manipulation, side effects of medications including dizziness and fatigue, inability to reach with the left arm/shoulder, imbalance with an antalgic gait, depression, anxiety, and loss of attention and concentration secondary to his physical and mental impairments." *Id*. at 31. As support, Plaintiff alleges that Dr. Arvary, Dr. Wright, physical therapist Ms. Sleece, and vocational rehabilitation counselor Ms. Erickson all concur with Plaintiff's limitations and disabilities. Pl. Br. at 31–34. He further argues

that the ALJ "chose to ignore or discredit the weight of the clinical findings and opinion evidence from treating and consulting sources without adequate explanation." *Id*. at 34.

The ALJ may make credibility determinations about a plaintiff's testimony, specifically with regard to pain and other subjective complaints. *Malloy v. Comm'r of Soc. Sec.,* 306 F. App'x 761, 765 (3d Cir. 2009) (citing *VanHorn v. Schweiker,* 717 F.2d 871, 873 (3d Cir. 1983)). However, rejection of subjective testimony must be based on substantial evidence in the record. *VanHorn,* 717 F.2d at 873–74. Furthermore, if the ALJ finds that Plaintiff's description of pain is not credible, the ALJ must make a negative credibility determination regarding the degree of subjective pain alleged. *Id*. at 873. In that respect, when reviewing a decision by an ALJ, this Court must defer to the ALJ's determinations on the credibility of the witnesses and on whether the claimant has satisfied the burden of proof. *See Horodenski v. Comm'r of Soc. Sec.,* 215 F. App'x 183, 188–89 (3d Cir. 2007); *Atlantic Limousine, Inc. v. NLRB,* 243 F.3d 711, 718 (3d Cir. 2001) (noting that where the ALJ has articulated reasons supporting a credibility determination, that determination will be entitled to "great deference").

Here, the ALJ rejected Plaintiff's subjective testimony based on substantial evidence in the record and provided clear reasoning in so doing. The ALJ notes that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . . [because] the overall objective medical evidence of record does not support the disabling conditions [Plaintiff] alleges." A.R. 64–65.

With respect to the chordoma, the ALJ's conclusion relies in part on Dr. Green's February 2010 report that "claimant was doing rather well with his headaches" and that "he had experienced one headache since October 2009." A.R. 65. The ALJ found inconsistencies with Plaintiff's

50

complaints of headaches and Dr. Nagendra's January 2013 report that his "headaches were good." A.R. 66. As discussed *supra* at Part IV(B)(1)(a-c), the ALJ's decision to accord little or no weight to multiple treating providers was based in substantial evidence. There, Plaintiff's argument that the ALJ chose to do so "without adequate explanation" has no merit.

As to Plaintiff's orthopedic impairments, the ALJ notes Plaintiff's physical examination on April 25, 2011 revealed "good power and tone of the upper and lower extremities [and] . . . . [Plaintiff's] gait was unremarkable." A.R. 65. She further describes Dr. Petrucelli's April 2011 report that Plaintiff had "full range of motion of the right hip . . . ." *Id*. Similarly, the ALJ noted Dr. Scalise's May 2011 report that Plaintiff had "some tenderness in the left hip but full range of motion and no swelling." A.R. 66. The ALJ also indicated that Dr. Arvary reported Plaintiff exhibiting "no motor, sensory or gait abnormalities" in July 2011. *Id*. The ALJ found inconsistencies between Plaintiff's subjective complaints of pain and the January 2012 report that Plaintiff "had been doing a lot of manual physical labor." *Id*. Further, Dr. Arvary reported that physical examination "revealed good motion of the back with mild pain to range of motion and good motion of the hips without pain." *Id*.

Third, regarding Plaintiff's mental impairment, the ALJ noted Dr. Arvary's January 2012 report, which found Plaintiff's "attention deficit disorder was alleviated with medication . . . . [and] his hypertension was stable and his spine pain was improving with injections." *Id*.

Because the ALJ articulates reasons supporting her credibility determinations, the Court accords great deference to the ALJ's credibility determination of Plaintiff's subjective testimony, and, in light of that deference, does not find remand to be warranted on this point. *See, e.g.*, *Malloy*, 306 F. App'x at 765 ("Credibility determinations as to a claimant's testimony regarding pain and other subjective complaints are for the ALJ to make. In view of the evidence presented in the

51

record and of the ALJ's 'opportunity to observe the demeanor and to determine the credibility of the claimant,' these findings are entitled to 'great weight' and should be upheld.") (internal citations and quotation marks omitted). The ALJ's determination that Plaintiff's description of his pain is not credible was based in substantial evidence, thus warranting a negative credibility assessment regarding the degree of pain alleged. *VanHorn,* 717 F.2d at 873–74.

### 3. ALJ's Conclusion Regarding Plaintiff's Residual Functional Capacity[9]

Plaintiff argues that the ALJ's RFC determination is incomplete. Pl. Br. 34. First, Plaintiff argues that the ALJ failed to discuss or evaluate Plaintiff's depression, anxiety, ADHD or personality disorder. [10] *Id*. at 35. Further, Plaintiff argues that the ALJ failed to consider Plaintiff's "chronic low back and leg pain and numbness, inability to bend, twist, and sit for more than 30 minutes, fatigue and need to nap during the day." *Id*. Plaintiff also asserts that "light work" requires an individual to be able to bimanually lift and carry up to 20 lbs., whereas Plaintiff alleges his testimony and the record indicate he could lift no more than 10 lbs. *Id*. Lastly, Plaintiff contends that the ALJ was incorrect in finding that Plaintiff could "frequently reach overhead with the dominant left upper extremity." Pl. Br. at 35; A.R. 63.

---

[9] Plaintiff alleges that the ALJ's RFC assessment was inconsistent with any hypothetical posed to the VE because she failed to provide the "occasional balancing" limitation in her question. Pl. Br. at 37. However, Defendant correctly notes that the ALJ later asked the VE whether an individual who was limited to "occasional balancing . . ." would be able to perform jobs. A.R. 146. Thus, the ALJ's hypothetical questions were in fact consistent, and not "defective" as Plaintiff asserts, with her determination of Plaintiff's RFC. Pl. Br. 37.

[10] Plaintiff also asserts that the ALJ failed to consider the combined effects of individual and multiple impairments "regardless of severity in determining [the] RFC." Pl. Br. at 35. This concern has already been considered in Plaintiff's first argument, to which this Court found that the ALJ adequately considered Plaintiff's impairments.

Defendant argues that the RFC assessment is supported by substantial evidence. Def. Br. at 22. Defendant asserts that the argument "essentially rehash[es] Plaintiff's first argument, which . . . has no merit." Def. Br. at 22.

"In making a residual functional capacity determination, the ALJ must consider all evidence before him," and must "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett*, 200 F.3d at 121. *Id*. Ultimately, "[w]here the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." *Hagans*, 694 F.3d 287, 292 (2012).

With respect to Plaintiff's first argument, the ALJ does in fact discuss Plaintiff's depression, anxiety, ADHD and personality disorder. The ALJ first notes Plaintiff's allegations in his testimony, A.R. 63, and then indicates Plaintiff's medical history including "history of panic disorder and adult attention deficit disorder." A.R. 65. The ALJ further discusses the conditions in relation to Dr. Wright, who diagnosed "major depressive disorder without psychotic features [and] personality disorder." A.R. 67. In addition, the ALJ indicates that Dr. Arvary diagnosed Plaintiff with "[ADHD], depressive disorder, and dependent personality disorder . . . ." *Id*. Furthermore, the ALJ repeatedly references Plaintiff's low back, leg pain, and numbness. A.R. 64–69. This court finds that the ALJ sufficiently discussed and evaluated these conditions.

Next, the ALJ's determination that Plaintiff could perform limited "light work" is consistent with the substantial evidence. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). As to Plaintiff's testimony, this Court has already held that the ALJ's decision to discredit some of Plaintiff's complaints was based in substantial evidence. Additionally, Plaintiff does not cite to the

record or specify any physicians who concluded he could lift no more than 10 pounds. Therefore, the ALJ's decision to include "light work" as part of the RFC is based in substantial evidence.

As to the ALJ's finding in Plaintiff's RFC that he could "frequently reach overhead with the dominant left upper extremity," the ALJ's determination is not supported by substantial evidence. Prior to the alleged onset disability date, Plaintiff was diagnosed with mild impingement of the left shoulder. A.R. 293–95. In April 2011, Dr. Cullen diagnosed Plaintiff with left shoulder adhesive capsulitis. A.R. 592. During Plaintiff's physical therapy for his left shoulder, it reportedly displayed limited range of movement, poor extension, decreased muscle strength, great difficulty with overhead elevation, and increased tenderness. A.R. 633–34. At Step Two, the ALJ found Plaintiff's left shoulder tendinosis to be a "severe impairment." A.R. 60. In her determination, the ALJ noted that she had considered the determinations of the non-examining consultants with the DDS and found that their conclusions were consistent with the evidence and their opinions were persuasive with respect to their RFC assessment. A.R. 69. The Disability Determination at the reconsideration level included limitations restricting Plaintiff to frequent reaching of the left upper extremity both in front and overhead. A.R. 177.

In light of the objective medical evidence, against which neither Defendant nor the ALJ offer contradictory evidence, it seems unlikely that Plaintiff could "frequently reach overhead and back and forth with the left upper extremity." While the ALJ is entitled to rely on non-examining state agency consultants as "opinion evidence," treating and examining physician opinions generally deserve more weight than the opinions of consultants or physicians who merely review records. *See* 20 C.F.R. §§ 404.1527(d)–(e); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). Here, the ALJ provided a mere conclusory statement as to her reliance on the opinion evidence of the non-examining consultants, rather than a sufficient explication with respect to the

54

relative weight of Plaintiff's treating physicians and the consultants. This Court finds that the ALJ's RFC assessment, as well as her determination of available jobs at Step Five, may have been meaningfully altered by a more satisfactory consideration of the objective medical evidence in connection with Plaintiff's left upper extremity. Thus, remand is warranted to reassess Plaintiff's RFC with regards to Plaintiff's left upper extremity restrictions.

### C. Step Five: ALJ's Determination of Plaintiff's Ability to Perform Other Work

Finally, Plaintiff argues that at Step Five, the ALJ failed to meet her burden of showing that Plaintiff could perform other work in the regional or national economy. Pl. Br. at 38. Plaintiff acknowledges that the SSA can take "administrative notice of reliable job information available from various governmental and other publications, including the *Dictionary of Occupational Titles* ("DOT") and the use of vocational or other specialists." *Id*. Plaintiff contends that in order for the SSA to rely on evidence by a VE, the evidence must be consistent with "regulatory policies and definitions and the ALJ has a duty to ask a VE to explain any conflict between the DOT and VE testimony." *Id*.

Here, Plaintiff asserts that with respect to the ALJ's conclusion that Plaintiff could work a variety of jobs in the national economy, "[r]eversible error was committed in that neither the VE nor the ALJ elicited DOT codes, description of the jobs or confirmed that [they] conformed with the DOT jobs in accordance with SSR 00-4p." *Id*. Plaintiff reasons that there was no administrative notice of reliable job information from the DOT because neither the ALJ nor VE referred to the DOT jobs. *Id*. at 39. Defendant maintains that based on the testimony, the ALJ's finding that Plaintiff could perform a significant number of jobs in the national economy was based in substantial evidence. Def. Br. at 23. With respect to the VE and ALJ's failure to provide corresponding DOT codes or descriptions, Defendant argues that Plaintiff's contention is without

merit. *Id.* at 24. Defendant further asserts that Plaintiff's argument regarding the ALJ's failure to discharge her duty to ask about consistency is contrary to the record. *Id.*

I find that Plaintiff's argument lacks legal foundation. *Ireland v. Barnhart*, 82 F. App'x 66, 72 (3d. Cir. 2003) ("There is no legal basis for Irelan's argument that 'if the claimant is to adequately test the accuracy of the VE testimony, the DOT numbers must be available'"). However, the SSA primarily relies on DOT information when making a disability determination, and the DOT is one of various publications used to take administrative notice of "reliable job information." SSR 00-4p (S.S.A. Dec. 4, 2000). Further, occupational evidence provided by a VE should be consistent with the occupational evidence provided by the DOT. *Id.* In cases with conflicts between the VE evidence and the DOT, the ALJ "must elicit a reasonable explanation for the conflict" and must "inquire, on the record, as to whether or not there is such consistency." *Id.*

Here, the record indicates that the ALJ conformed to the regulations. The ALJ asked the VE whether his testimony was consistent with the DOT, and the VE confirmed that his testimony was consistent. A.R. 150. Moreover, the ALJ noted in her decision that the VE's testimony is "consistent with the information contained in the [DOT]." A.R. 70. SSR 00-4p provides an "affirmative responsibility" to ask about a possible conflict "when a VE . . . provides evidence about the requirements of a job or occupation." SSR 00-4p. Thus, in its literal terms, SSR 00-4p applies only to the limited portion of the VE's testimony regarding the requirements of a job or occupation, and the VE did not testify as such here. *See Rutherford v. Barnhart*, 399 F.3d 546, 556 (explaining that SSR 00-4p only applied to limited circumstances).

Nonetheless, inconsistencies between VE testimony and DOT information may violate a "more general requirement," even when not within the literal bounds of SSR 00-4p. *Id.* In that connection, Plaintiff alleges that the occupations described by the VE and later relied on by the

ALJ "were not described with enough specificity" to support the ALJ's finding that there were no conflicts between the DOT and the VE's testimony. Pl.'s Reply Br. at 11. Plaintiff, however, raised this argument for the first time in his reply brief. "A moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief." *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 533 n.3 (D.N.J.1999) (citing *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d 1318, 1327 n.11 (3d Cir. 1992) (refusing to consider an issue raised for the first time in a reply brief)). Consideration of this argument by the Court would clearly prejudice Defendant, who was not given an opportunity to respond to Plaintiff's argument. *See United States v. Boggi*, 74 F.3d 470, 478 (3d Cir. 1996) (declining to consider arguments raised in a reply brief to avoid prejudice to appellees); *Stern v. Halligan*, 158 F.3d 729, 731 n.3 (3d Cir. 1998) ("A party cannot raise issues for the first time in a reply brief."). Therefore, the Court will not consider Plaintiff's arguments with respect to the specific conflicts between the VE's testimony and the DOT.

However, to the extent that the ALJ's errors at Steps Three and Four may have resulted in an erroneous RFC assessment and, thus, an erroneous finding that Plaintiff could perform other work in the regional or national economy, remand is warranted at Step Five, as well.

## V. Conclusion

For the foregoing reasons, this Court finds that it would be appropriate to remand this matter for rehearing (1) at Step Three, for further consideration and a more satisfactory explication of whether Plaintiff's orthopedic impairments met or equaled the Section 1.04 listing requirements and whether Plaintiff's mental impairments met or equaled the criteria for Sections 12.02–12.08; and (2) at Step Four, for reassessment of Plaintiff's residual functional capacity in consideration

of Plaintiff's left upper extremity restrictions; and (3) if necessary, at Step Five, for reassessment of whether Plaintiff could perform other work in the regional or national economy.[11]

Accordingly, this case is reversed and remanded to the ALJ for further administrative review consistent with this Opinion. This matter is remanded to the Social Security Administration.

An appropriate Order shall follow.


Dated: July 1, 2015                                  /s The Honorable Freda L. Wolfson
                                                     United States District Judge

---

[11] The Court recognizes the existence of the "harmless error" doctrine, in which findings of the ALJ that would have no effect on the ALJ's ultimate decision do not warrant remand. *See Jackson v. Barnhart*, 120 F. App'x 904, 906 (3d. Cir. 2005) (citing *Boone v. Barnhart*, 353 F.3d 203, 209 (3d. Cir. 2003)) (finding where the ALJ's error "is harmless, [the] court will not reverse the ALJ's decision."); *see also Perkins v. Barnhart*, 79 F. App'x 512, 515 (3d Cir. 2003). Here, however, this Court is unable to determine whether the ALJ's numerous errors were, in fact, harmless. Accordingly, the Court cannot apply the harmless error doctrine here; as such, remand is warranted.